607 So.2d 634 (1992)
In re JWR and RKR Applying for Adoption of JEM.
No. 24,688-JA.
Court of Appeal of Louisiana, Second Circuit.
October 1, 1992.
Writ Denied November 20, 1992.
Northwest Louisiana Legal Services by Leon L. Emanuel, III, Shreveport, for appellants.
Maurice Loridans, Bossier City, for appellees.
Before HIGHTOWER, VICTORY and STEWART, JJ.
STEWART, Judge.
In this contested private adoption, the biological parents (RM and TM) have appealed the interlocutory judgment of adoption of JEM in favor of the adoptive parents (JR and RR). In this dispute in which neither biological nor adoptive parents are unfit, the primary issue is whether the trial court erred in applying the standards of In re JMP, 528 So.2d 1002 (La.1988) and finding *635 that this record supports granting the interlocutory judgment of adoption. Because we are constrained to follow In re JMP, supra, and this record supports the trial court's factual findings, the judgment is affirmed.
At the outset, we note that In re JMP, supra, and LSA-CH.C. Art. 1143 mandate that this matter be decided within 20 days of the lodging. This record was lodged in its entirety in this court on September 14, 1992. The 20-day period for appellate review is calculated from that date.

THE CHILD
JEM was born on October 19, 1991. His biological parents are RM and TM. JEM was released from the hospital to the adoptive parents. The child, now 11½ months old, has had no contact with his biological parents.

THE BIOLOGICAL PARENTS
TM, the biological mother, was born February 24, 1970, and is 22 years of age. She married RM in 1988 and has given birth to three children. Their first child was hit by a truck and died of head injuries. Their second child, a daughter, is two years old. The third child, who was surrendered for adoption, was born October 18, 1991. TM has one sister and five half-siblings. Her parents were divorced when she was 12 years of age. She has had limited contact with her father and her mother is an alcoholic. A step-father was sexually abusive to TM's sister. TM lived for some periods with grandparents and other family members. She had an unstable, troubled early family environment; completed the 10th grade and married at age 17. A homemaker, TM babysits other children in her home.
RM, the biological father, was born June 28, 1967, and is 24 years of age. He is employed at an auto parts business where he disassembles wrecked and damaged automobiles. An abused child, RM also came from a dysfunctional family. His father married three times and his five siblings are half-brothers and sisters with whom he has no contact. The family traveled between Michigan, Indiana and Florida. His father put him to work in the fields at age 9. RM quit school after the 9th grade.
RM and TM were living in Florida when they discovered that TM was five months pregnant with JEM. Because TM had medical complications with a previous birth and did not want to use the medical facilities available in Florida, the family returned to Shreveport. Unemployed and without financial resources, the family resided with TM's mother in a very chaotic situation. In addition to TM's mother's alcoholism, living conditions were very crowded. Five of TM's siblings, TM's mother, the mother's boyfriend, and their family of three resided there.

THE ADOPTIVE PARENTS
The adoptive mother, RR, was born May 13, 1960, and is 32 years of age. A kindergarten teacher in the Caddo Parish public schools, RR completed high school, college, her masters degree and college credits beyond her masters. An only child, she had a happy and stable childhood. Her father died when she was a young adult. Active in her church and in charge of the church nursery for many years, RR has been married for ten years. She and her husband socialize with family and friends.
JR, the adoptive father, is 18 years older than RR. JR has a loving, close family and stable employment as a plumber for a construction company. The couple attempted one previous adoption which was not completed because the birth mother changed her mind prior to surrendering the child for adoption. JR's mother keeps JEM in the couple's home when they work.
Previously married and divorced, JR has no children. In his divorce his ex-wife alleged JR harassed her daughters. However, nothing in that record indicated any physical abuse to those children. He testified that they did not get along because the children and their mother resented his attempts to govern their behavior.

FACTS
TM determined that she wanted to surrender the child for adoption. She answered *636 a newspaper ad and contacted an attorney in New York. TM agreed to place her child for adoption through that attorney and received substantial payments for living expenses for July and August of 1991. TM also contacted an attorney in Baton Rouge and received payments for living expenses from that attorney for the same time period. In late August, TM made contact with a Bossier City attorney after having been referred there by a mutual friend. She received in excess of $4,500 in living expenses through that attorney. Apparently, because of the financial assistance she received from the attorneys, TM and her family were able to rent a house of their own, and remove themselves from the conflict involved in living with TM's family.
Pursuant to a consent form signed by TM and RM, hospital personnel released the child to the adoptive parents. TM was released from the hospital on October 23. Maurice Loridans, attorney for the adoptive parents; Jan McKinnon, a firm employee with whom TM had been primarily dealing; F.Q. Hood, Jr., as attorney for the biological parents; and two witnesses went to the biological parents' home October 23 where they executed a surrender of JEM for adoption. On October 29 the biological parents executed a notarial act which revoked their consent to the adoption. On October 31, the trial court signed the order attached to the adoption petition and set the matter for hearing on December 17. However, RR's and JR's adoption petition was not stamped filed by the Clerk of Court until November 7. That petition did not refer to the biological parents' revocation of the surrender. The adoptive parents' attorney received the revocation on November 1.
On November 20, 1991, Northwest Louisiana Legal Services, Inc. filed a motion and order to enroll as counsel for the biological parents. The matter was set for argument December 2, 1991. On December 2, the trial court signed an order allowing TM and RM to intervene within 15 days in the adoption proceedings. A home-study of the intervenor's home was ordered to be completed not later than December 20. The December 17 hearing on the interlocutory decree of adoption was upset to be refixed after a "reasonable period for pleadings and discovery."
In their intervention filed December 26, 1991, the biological parents contended that the surrender was entered under duress and threats. These allegations are not being pursued. They prayed that the child be returned to them during the pendency of the proceedings or, alternatively, that they be granted reasonable visitation. However, the order which they presented to the trial court provided only that the intervention be permitted and that the biological parents be able to proceed in forma pauperis.
The adoptive parents answered the petition for intervention and propounded interrogatories on January 14, 1992. Discovery continued throughout January, February and March. On February 10, the adoptive parents filed a motion, pursuant to agreement reached at a status conference February 6, that both the adoptive and biological mothers be subjected to complete psychological evaluation and testing in order to see whether the adoption was in the best interest of the child. Dr. Donita Gothard was appointed to conduct the evaluation. On February 21, 1992, the trial court signed an order appointing, at the request of the biological parents, Dr. Mark Vigen to be an additional psychologist in the case and to examine the biological parents and the petitioners applying for adoption.
On April 14, 1992, the biological parents filed for summary judgment and objected to being examined by Dr. Gothard, since they had been examined by Dr. Vigen. On April 20, opposition to the motion for summary judgment was filed along with supplemental answers to interrogatories. The motion was argued and denied in chambers the same day. They also filed a motion for immediate visitation privileges with the child. For reasons orally assigned, the visitation motion was denied. The biological mother's right to seek supervisory review was reserved. TM was ordered to report to Dr. Gothard for evaluation. The matter was set for trial for May 12. Both the *637 adoptive and the natural parents filed supplemental answers to interrogatories in early May.
Trial on the adoption was conducted May 12, 14, 15, 18, 20, 21, 22, 28 and 29. On June 3, attorneys for the biological and adoptive parents presented arguments to the court which took the matter under advisement. On July 6, the trial court signed and filed written reasons granting the interlocutory decree of adoption. The judgment awarding the interlocutory adoption was signed and filed July 21, 1992.
The biological parents suspensively appealed the judgment July 29, 1992, and requested all relief under LSA-CH.C. Art. 1143 and In re JMP, supra. The trial court set a return date for appeal of August 18. On August 13, the biological parents sought from the trial court and got an extension of the appeal return date from August 18 until September 18.
The biological parents on July 23, 1992 requested supervisory review of the April denial of visitation. That application, No. 24,576-CW, did not comply with URCA 4-2 and 4-3. This court passed that matter to give the biological parents' attorney an opportunity to comply with the URCA. When the needed supplementation was not received, the writ was denied August 20, 1992. A subsequent writ application, No. 24,644-JW, filed August 25 complied with the URCA. On September 3, 1992, this court denied the writ application because the biological parents had an adequate remedy for their visitation complaint in their expedited appeal; i.e., this court could reach a decision on the merits of that complaint just as quickly in the appeal on the merits. In addition, the court found that the trial court had improperly extended the return date and directed that the record be lodged within five days. Upon assurance from the trial court that it was not physically possible to have the transcript completely transcribed within five days, the juvenile court was given until September 14 to lodge the record.

DISCUSSION
Our standard of review in this case is manifest error. The trial court's factual findings are entitled to great weight and will not be disturbed on appeal absent a showing of manifest error. We recognize that the trial court is in a better position to evaluate live witnesses as opposed to our review of the written record. In re Baby Boy Smith, 602 So.2d 144 (La.App. 5th Cir.), writ denied, 602 So.2d 6 (La.1992).
In In re JMP, supra, the supreme court exercised its supervisory jurisdiction and ordered that contested private adoptions be handled expeditiously within the following time frames:
(1) Upon receipt of formal or informal notice that the natural mother has revoked her consent to the surrender for adoption, the trial court is ordered to hold a hearing and decide the best interest issue and any related issue within 20 days of receipt of such notice.
(2) The trial court was ordered to fix the return date of any appeal no more than 20 days from the time costs are paid. Further, the court directed that emergency supplemental court reporting services could be paid for by the judicial administrator.
(3) The court of appeal was ordered to hear and decide appeals within 20 days of lodging.
All courts are urged to comply with the spirit as well as the letter of this order to prevent delays that unjustly may destroy the natural parent's rights under the statute or have a harmful effect upon the child.
In re JMP, 528 So.2d at 1017.
Unfortunately, this case is a perfect example of the problematic situation which the supreme court sought to avoid with the directives of In re JMP. This court is now required to decide this case, the procedural history of which was conducted in total disregard of In re JMP.
The record does not indicate that JMP was ignored in bad faith. The record also supports the admission of the biological parents' counsel who candidly acknowledged in oral argument before this court that the majority of the delays were attributable to his office's handling of the case, *638 while some of the responsibility rests with the trial court and a far lesser amount, with the counsel for the adoptive parents. The trial court first erred on December 2 in upsetting without date the best interest hearing originally set for December 17, 1991, and in allowing a "reasonable period for pleadings and discovery." JMP mandated that hearing be held twenty days from the trial court's notice of revocation of the natural parents' surrender. Although the goals of delays to permit discovery and psychological evaluations are laudable, the time frames mandated in JMP are not flexible.
Further, the trial itself was spread out over 23 days including closing arguments. JMP requires contested adoptions to be tried expeditiously and to take precedence over other matters docketed. Trial courts must conduct the best interest hearing within the 20 days of notice of revocation of the surrender. If necessary to comply with the time strictures of In re JMP, court sessions should go into the night and through weekends and holidays. In these extraordinary situations, the trial court is bound to set discovery deadlines which insure that counsel for biological and adoptive parents conduct whatever discovery is possible within the strict time constraints of JMP.
In this matter, 33 days elapsed between submission of the case to the court and rendition of reasons for judgment. Another 15 days passed before the adoption judgment was signed. In re JMP mandates that the trial court decide the child's best interest and any related issue within 20 days of receipt of formal or informal notice of the biological mother's revocation of surrender.
The record supports the trial judge's conclusion that both the formal act of surrender and the revocation of that surrender were in proper form and timely executed. JEM's biological parents executed a voluntary surrender of his custody for private adoption. LSA-R.S. 9:422.3. The surrender was made to a person acting for a couple qualified to petition for adoption and only for the actual purpose of adoption. LSA-R.S. 9:422.5 and 9:422.9. RM and TM signed the surrendering documents freely and voluntarily after having been informed and indicating that they understood their rights to JEM were terminated. LSA-R.S. 9:422.6(A)(11). The formal act of surrender was signed the fifth day following the child's birth, and the surrendering biological parents were represented by an attorney at the execution of the act. LSA-R.S. 9:422.7. By that act of surrender the biological parents transferred legal custody of JEM to the adoptive parents and granted consent to his adoption. LSA-R.S. 9:422.8. Attached to the adoption petition was the biological parents' social history in which TM stated:
We feel we cannot take care of another child mental (sic) or physical (sic). We are very positive about the adoption.
F.Q. Hood, Jr., acting as their attorney, explained to the biological parents that the act of formal surrender granted their irrevocable consent to the adoption subject only to the exceptions in LSA-R.S. 9:422.10 which provides that surrendering parents may oppose the adoption only within 30 days of executing the surrender. Further, the biological parents understood that the withdrawal of consent under LSA-R.S. 9:422.10 would not prevent JEM's adoption if the adoption was found to be in his best interest. LSA-R.S. 9:422.11. On October 29, 1991, RM and TM executed a notarial act revoking the consent to adoption. The opposition was received by the attorney of the adoptive parents on November 1, 1991. LSA-R.S. 9:422.10.
This court must determine whether the trial court's ruling in favor of the adoptive parents was in the best interest of the child in accordance with LSA-R.S. 9:422.11(A) and In re JMP, supra. In re JMP provided that the burden of proof with respect to the best interest of the child is on the adoptive parents, not the biological parents. The best interest of the child must be decided on the particular facts of each case. The trial court is vested with great discretion which is not absolute. The trial court's best interest determination is subject to reversal if the record reveals *639 manifest error in the determination. In re Baby Boy Smith, supra.
In re JMP stated the three most important factors to be considered in a private adoption case in determining the best interest of the child are fitness, psychological attachment and the biological relationship of the child to his natural parents.
When the natural parent poses no danger to the child's physical health, and the child has not yet formed an attachment to and begun to view one of the adoptive parents as his psychological parent, the natural parent should be preferred.... If the natural mother is fit, the broad social policy of basing custody and responsibility on the biological relationship outweighs whatever material advantages might be provided by the adoptive parents, if neither of the adoptive parents is the child's psychological parent. On the other hand, if the adoptive parents are fit, and the child has formed a psychological attachment to one or both of them, the adoptive parents should be preferred so as to avoid the grave risk of mental and emotional harm to the child which would result from a change in custody even if the natural parent is relatively affluent.
In re JMP at 1014, 1015, 1016. In JMP, there was no psychiatric or psychological testimony concerning whether the child had developed a psychological relationship with one of the adoptive parents. JMP was five months old at the time of the best interest hearing, seven months old when the adoption was granted, over two years old when the court of appeal affirmed, and was two and one-half years old when the supreme court reached its decision. The supreme court remanded JMP for the development of evidence on the child's psychological attachment to the natural and/or adoptive parents.
In re Baby Boy Smith, supra, is factually similar to this dispute. The Smith child was born October 4, 1991, just two weeks before JEM's birth. When the best interest hearing was held on April 6 and 7, the Smith child was six months old, eight months old when the appellate court decision was made, and nine months old when the Louisiana Supreme Court denied writs. The trial court found Baby Boy Smith's biological mother made a knowing, voluntary and valid surrender and that her revocation of that surrender was timely. Therefore, the court relied upon LSA-R.S. 9:422.11(A) and In re JMP, supra, to decide whether the adoption was in the child's best interest. The trial court found that remaining with the adoptive parents served the child's best interests. The adoptive parents were fit to serve as the child's parents and, from the child's perspective, the adoptive parents had become the psychological parents. In affirming that decision, the appellate court noted that two psychologists had testified concerning psychological bonding and the attachments this child had with the adoptive parents.
TM and RM assert that natural parents have a paramount right to custody of their child against non-parents or third parties. This well-settled legal principle was acknowledged by the supreme court in In re JMP. However, in this case, RM and TM executed a valid surrender granting custody of the child to the adoptive parents and consent to his adoption. LSA-R.S. 9:422.8. Under the statutory law then effective, they had 30 days within which to oppose the adoption and revoke the consent given in the surrender.[1] LSA-R.S. 9:422.10. Because they timely and properly exercised their right to revoke their consent, the trial court was required to decide the adoption based on JEM's best interest. LSA-R.S. 9:422.11.
In re JMP has set out the guidelines to be followed to determine the best interest of JEM. Had either the biological or the adoptive parents been determined to be unfit, *640 the inquiry would have ended with the child's custody being awarded to the fit set of parents. Dr. Donita Gothard examined the biological and adoptive mothers. Dr. Mark Vigen examined the biological parents. Both agreed that neither set of parents is unfit.
Because both set of parents are fit, JMP mandates returning the child to his natural parents unless, from the child's perspective, one or both of the adoptive parents had become the child's psychological parent. At trial both psychologists recognized the existence of the psychological parent/child relationship between JEM and the adoptive parents. Considering the expert testimony along with all the other evidence, the trial court concluded that a psychological relationship existed between the adoptive parents and JEM and was particularly strong between the child and the adoptive mother. Although Dr. Gothard had not examined JEM, she concluded that psychological bonding of JEM with the adoptive parents existed based upon her knowledge of the adoptive mother, the facts of this particular case and the psychological literature. Dr. Vigen declined to give an opinion about the psychological bond between JEM and the adoptive parents. However, he did not dispute the existence of the parent-child psychological relationship with the adoptive parents based on his knowledge of the case.
This factual conclusion is supported by the lay testimony in the record. When the adoptive parents received custody of JEM, RR took a maternity leave from her teaching position to stay with the infant. When she returned to her employment, JR's mother came to their home to keep him while they are at work. When the child was approximately four months old, he became seriously ill with a respiratory virus for which he was hospitalized for five days. The adoptive mother stayed with him day and night and only left his side once to get clean clothes while the adoptive father stayed with him. Due to the child's low resistance and the contagiousness of the virus, the adoptive parents and his adoptive paternal grandmother kept him at home away from others for several weeks after he was released from the hospital. The adoptive parents described their routine of caring for and playing with JEM when they come home. The child's great attachment to and affection for the adoptive parents was corroborated by the testimony of a number of friends and relatives. JEM was stated to be a happy, well-adjusted child who, by his actions, continually expressed his desire to be near the adoptive parents.
The primary difference in Drs. Gothard's and Vigen's testimony concerned the effect of severing the psychological relationship with the adoptive parents if JEM were returned to his biological parents. Both experts agreed that the effect of severing a psychological parent/child relationship would be difficult to determine. However, Dr. Gothard concluded that it would be immediately and substantially detrimental to JEM's psychological well being to be returned to his biological parents because that would disrupt the bonding established and his security. Dr. Vigen opined that a child could have several parent/child psychological bonds and that the biological parents were not a psychological threat to the child. However, Dr. Vigen recommended that any return of the child to his biological parents should be done in a gradual manner.
As we read In re JMP, the issue of severing the psychological bond between a child and the adoptive parents does not arise if that relationship is found to be present. At that point the inquiry ends, and the adoption is granted in favor of the adoptive parents.
In our view, such a hard-and-fast approach greatly emphasizes psychological bonding at the expense of the biological parents' rights. More specifically, we can foresee circumstances in which the biological parent should receive custody of the child in spite of a psychological relationship existing between a child and an adoptive parent. For instance, a child with psychological relationships with both the natural and the adoptive parents should be returned to his biological parents due to the importance of preserving that relationship. *641 It is also possible to visualize biological parents, despite persistent requests to the trial court, being deprived of contact with their child. Even under such circumstances, however, the In re JMP standard will result in a grant of adoption based upon de facto psychological bonding with the non-parents. Conversely, in the case at hand, it is apparent to us that another outcome could have resulted had the matter been tried within the time constraints of In re JMP before any substantial psychological bonding had occurred with the adoptive parents.
We further note that significant disagreement exists among psychologists concerning the consequences when a child sustains a loss, change or interruption in the parent-child psychological relationship. One side of that view is illustrated by the two psychologists who testified in In re Baby Boy Smith, supra. One stated that children whose bonding is disrupted will develop interpersonal relationship problems. The other opined children separated early in life from parents will have incredible problems in their social and emotional development. That approach, however, has been sharply criticized by others including clinical psychologist, Dr. Chin-Chin Ho, who co-authored "Child Custody Awards to Non-parents under Art. 146(B)," 33 Loyola L.Rev. 51 at 66 and 70 (1987).
Expert testimony that separation per se is harmful should be viewed with skepticism for several reasons.... Permanent detriment from severance of a psychological parent relationship is not the typical outcome. More recent literature indicates that separation per se is not harmful and that a proper assessment of the effects of separation on a child requires an individualized consideration of a multitude of factors....
Dire predictions of serious harm by advocates of the psychological parenting theory must be placed in their proper perspective. Most children do not suffer severe or permanent harm from separation per se. Applied to parent-nonparent litigation, the recent psychological studies suggest that the quality of care by the parent would be a significant factor in assessing the probability of serious emotional harm to the child. In addition, the individual traits of a child are important in assessing whether the child will experience long-term detriment. For example, if the child has developmental disabilities, abnormal overdependency, emotional instability, or has multiple placements in the past, he may be more vulnerable to separations than the average child. Individual factors, which indicate a vulnerability to harm from separation, should be fully developed since recent studies indicate that permanent detriment is the exception rather than the rule.

CONCLUSION
The record in this case supports the trial court's finding that JEM has developed a psychological relationship with his adoptive parents. The trial court's conclusion that the adoption is in JEM's best interest is not manifestly erroneous under the particular facts of this case. We, along with the trial court, are bound by the guidelines of In re JMP, which have been properly applied in awarding the interlocutory judgment of adoption in favor of the adoptive parents. Other issues have been raised which we find have no merit. The judgment is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] We note that under the Louisiana Children's Code, effective January 1, 1992, the 30-day period within which natural parents may revoke the surrender is now eliminated. A surrender like that signed by TM and RM is now irrevocable unless annulled by proof of fraud or duress. That action must be brought within 90 days of execution or the adoption decree, whichever is earlier. LSA-Ch.C. Arts. 1147 and 1148.